820 A.2d 677 (2003)
359 N.J. Super. 497
Stephen KAVKY, Plaintiff-Appellant,
v.
HERBALIFE INTERNATIONAL OF AMERICA, Defendant-Respondent, and
Jerry Homan, individually and d/b/a RBP International, Richard Palmer, individually and d/b/a RBP International, and Sonia Palmer, individually and d/b/a RBP International, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted March 25, 2003.
Decided April 22, 2003.
*678 Gary P. Levin, Mays Landing, attorney for appellant.
Goodwin Procter, attorney for respondent (Glenn S. Kerner and Melanie H. Muhlstock, of counsel and on the brief).
Before Judges STERN, COBURN and COLLESTER.
The opinion of the court was delivered by COBURN, J.A.D.
Plaintiff, Stephen Kavky, sued defendants, Herbalife International, Inc. ("Herbalife") and Jerry Homan, Richard Palmer, and Sonia Palmer, all doing business as RPB International, as well as that entity itself, alleging common law fraud and violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -109 (the "Act"). The action arose from plaintiff's purchase of a franchise or distributorship offered by defendants in advertising addressed to the general public at large. Herbalife responded by immediately filing a motion to dismiss the complaint for "failure to state a claim upon which relief can be granted." R. 4:6-2(e). The trial court granted the motion for two reasons: it found that the facts were alleged without sufficient particularization, and it held that the Act did not apply to investments of this nature. Plaintiff appealed.[1] Since we reject both determinations, we reverse and remand.

I

THE COMPLAINT
The complaint, read indulgently, as is required by Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989), alleges the following facts.
*679 Herbalife uses general advertising over the Internet to solicit distributors for a variety of products it sells in the United States. Plaintiff viewed the advertising in or around January 2000. Herbalife's offer was to make anyone a distributor in return for $85 and to provide "Pre-Paid Retail Internet Customers" at $8.50 per customer. Plaintiff responded to the advertisement, agreeing to become a distributor and to purchase ten customers. On January 18, 2000, Herbalife sent him a bill for $170, which he immediately paid. Although Herbalife sent him materials relating to his distributorship, it never intended to send him any "Pre-Paid Retail Internet Customers," and it failed and refused to do so. Plaintiff spent "significant amounts of money and expended hundreds of hours of work[] to establish a network of Herbalife Distributors upon becoming a Distributor." However, his efforts proved fruitless because of Herbalife's failure to provide the promised customer leads.[2] As a matter of form, the complaint asserts those allegations as against the defendants generally without specifying which defendant did what or the nature of their relationships.

II

THE CONSUMER FRAUD ACT CLAIM
The Act was first applied to franchises and distributorships offered to the general public over thirty years ago. Kugler v. Koscot Interplanetary, Inc., 120 N.J.Super. 216, 293 A.2d 682 (Ch.Div.1972). That case, which involved a pyramid sales scheme, was prosecuted by the Attorney General, who obtained damages for the victimized citizens and injunctive relief to protect the public at large. Id. at 232-33, 258-59, 293 A.2d 682. Other states have applied their consumer protection acts in similar circumstances, citing Koscot. See, e.g., State ex rel. Edmisten v. Challenge, Inc., 54 N.C.App. 513, 284 S.E.2d 333, 336-37 (1981); People ex rel. Fahner v. Walsh, 122 Ill.App.3d 481, 77 Ill.Dec. 691, 461 N.E.2d 78, 82 (1984). In a later Law Division case, Koscot was followed and expanded to cover small franchise and distributorship agreements not covered by the Franchise Practices Act, N.J.S.A. 56:10-1 to -7.1. Morgan v. Air Brook Limousine, Inc., 211 N.J.Super. 84, 90-100, 510 A.2d 1197 (Law Div.1986).
Unfortunately, the Court of Appeals for the Third Circuit, in a case involving New Jersey law, has cast doubt on the validity of Koscot's application of the Act and the reasoning of Morgan. J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1270-74 (3d Cir.1994). The federal court concluded that the State Supreme Court "would not adopt the reasoning in Morgan or apply the result in Koscot," id. at 1271, but would hold, instead, that the Act is inapplicable to any distributor or franchise relationship, including those made available to the public at large, because those transactions involve the purchase of a business, id. at 1272, 1274. Notwithstanding our high regard for the Third Circuit, we are unable to agree with its unduly restrictive interpretation of the Act. However that is not to say that we disagree with the result reached in J & R, but that is only because it appears to have involved a substantial and complex commercial transaction, which likely fell within the Franchise Practices Act. We cannot endorse J & R's reasoning because that course would deprive the citizens of New Jersey of protection under the Act in pyramid sales schemes, and similar mass public frauds, a *680 consequence we believe the State Supreme Court would reject.
The Act creates a cause of action for "unconscionable commercial practice[s]... in connection with the sale or advertisement of any merchandise or real estate...." N.J.S.A. 56:8-2 ("Section 8-2"). "Merchandise" is defined as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c) ("Section 8-1(c)"). Although the Act is entitled "An Act concerning consumer fraud, its prevention, and providing penalties therefor," L. 1960, c. 39, it contains no definition of consumer. The novel issue, at least at the appellate level in this state, is whether the purchaser of a franchise distributorship is protected by the Act, or to put it somewhat differently, do franchises and distributorships come within the Act's definition of merchandise. Our answer is that they are included when they are not covered by the Franchise Practices Act and are offered to the general public.
The court in J & R began its analysis by emphasizing the Supreme Court's reference to consumers in Kugler v. Romain, 58 N.J. 522, 535, 279 A.2d 640 (1971) and in Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 270, 390 A.2d 566 (1978), but those cases neither discussed who would be included within that concept, nor considered the meaning of the statutory word "merchandise." Therefore, we do not agree with J & R's conclusion that those cases support the proposition that the Act can never be applicable to the purchase of a "business." 31 F.3d at 1272.
J & R looked next to Neveroski v. Blair, 141 N.J.Super. 365, 358 A.2d 473 (App.Div.1976). Neveroski concerned the sale of a private home that occurred before Section 8-2 was amended by the addition of the phrase "or real estate." Id. at 376, 358 A.2d 473. Relying in part on the doctrine of ejusdem generis and in part on the idea that the Act was intended to protect "consumers in the popular sense ... in the context of the ordinary meaning of that term in the market place," id. at 378, 358 A.2d 473, the court reversed the judgment against the broker, id. at 380, 358 A.2d 473. The court further defined consumers as
[those who] purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques.

[Id. at 378, 358 A.2d 473.]
The court gave two reasons for excluding the broker from the Act. While recognizing that a broker provides "services," which are included in the Act, it held that his "semi-professional status" protected him from the Act's coverage. Id. at 379-80, 358 A.2d 473. We have since rejected that view with respect to professionals. Macedo v. Russo, 359 N.J.Super. at 83-84, 819 A.2d 5 (2003); Blatterfein v. Larken Assocs., 323 N.J.Super. 167, 175-83, 732 A.2d 555 (App.Div.1999). And in Strawn v. Canuso, 140 N.J. 43, 657 A.2d 420 (1995), the Court held that "[r]eal estate brokers, agents, and salespersons representing professional sellers of real estate are subject to the provisions of the Consumer Fraud Act." Id. at 60, 657 A.2d 420. Neveroski also excluded the broker because of its interpretation of Section 8-1(c)'s concluding phrase, "or anything offered, directly or indirectly to the public for sale." Applying the doctrine of ejusdem generis, the court decided that that phrase did not include real estate. 141 N.J.Super. at 378, 358 A.2d 473. The court reasoned as follows:
The additional general language can be construed under the doctrine of ejusdem *681 generis as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words. Real estate is wholly foreign to any of the listed examples specifically referred to in the definition. The inclusion of the general language can logically be attributed to a legislative desire to incorporate other consumer transactions which may not strictly come within the specifically defined categories.
[Id. at 379, 358 A.2d 473 (citations omitted).]
Accepting Neveroski's definition of a consumer, and finding that "franchises" are foreign to the specific examples listed in Section 8-1(c), J & R held the Act inapplicable to all franchise transactions. 31 F.3d at 1273. As will be explained later, we disagree with this overbroad application of the doctrine of ejusdem generis. For now, we would emphasize that J & R did not involve marketing to the general public; rather it concerned a substantial and complex commercial transaction. Id. at 1262-64.
As further support for its conclusion, J & R relied on the Law Division's opinion in BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J.Super. 271, 597 A.2d 1109 (Law Div.1990). That case, a dispute among three multi-million dollar international corporations, arose in a complex commercial setting involving the purchase of technology and engineering support services. Id. at 273-76, 597 A.2d 1109. In rejecting the claim that the Act applied, the court emphasized that portion of Section 8-1(c) which reads "to the public for sale." Id. at 277, 597 A.2d 1109. The court said: "Even if the court were to find that this new experimental process was a service sold to plaintiff, the process was certainly not the type of service contemplated by the Act, nor was it sold or capable of being sold `to the public.'" Id. at 278, 597 A.2d 1109.
J & R described BOC's holding in this manner:
The court determined that the technology and services acquired in BOC Group were not merchandise because they were not "available to the public at large and sold in large quantities" or "mass produced." [BOC Group, 251 N.J.Super. at 279, 597 A.2d 1109.]

[31 F.2d at 1274.]
We agree with that interpretation of BOC, but find that it tends to buttress our position precisely because we are dealing with a situation that involves mass-marketing to the public.
In Kugler v. Romain, supra, 58 N.J. at 536, 279 A.2d 640, the Court described the Legislature's reason for adopting the Act:
Obviously [the Legislature] recognized that the deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods frequently produce an adverse effect on large segments of disadvantaged and poorly educated people, who are wholly devoid of expertise and least able to understand or to cope with the "sales oriented," "extroverted" and unethical solicitors bent on capitalizing upon their weakness, and who therefore most need protection against predatory practices.
[Emphasis added.]
And in Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 741 A.2d 591 (1999), the Court reiterated the proposition that the Act is "remedial" and therefore "its provisions are [to be] construed liberally in favor of the consumer to accomplish its deterrent and protective purposes." Id. at 139, 741 A.2d 591 (citations omitted). Moreover, noted the Court, the "`history of the Consumer Fraud Act is one of constant *682 expansion of consumer protection.'" Ibid. (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 691 A.2d 350 (1997)).
In Hundred East Credit Corp. v. Eric Schuster, 212 N.J.Super. 350, 355, 515 A.2d 246 (App.Div.), certif. denied, 107 N.J. 60, 61, 526 A.2d 146 (1986) we applied the Act to a corporation's purchase of computer equipment for use in its business operations. We held that the Act was not limited "to sales and advertising of merchandise for `personal, family or household use.'" Id. at 356, 515 A.2d 246. We said: "Such a reading would fly in the face of the statutory definitions of `merchandise' and `person' entitled to sue." Ibid. (citing Morgan, supra, 211 N.J.Super. at 100, 510 A.2d 1197 and Koscot, supra, 120 N.J.Super. at 233, 293 A.2d 682.). Later, we interpreted the Act as providing protection for a corporation that contracted for renovations to its commercial property. Marascio v. Campanella, 298 N.J.Super. 491, 498, 689 A.2d 852 (App.Div.1997). We explained the result in this manner:
Given the broad scope of the Act and its liberal construction, so long as the disputed contract involves goods or services generally sold to the public at large, the mere fact that a corporation purchases the goods for use in its business does not preclude invocation of the Act....
[Id. at 499, 689 A.2d 852 (citations omitted).]
Although we have occasionally referred to a dictionary definition of a consumer as "one who uses (economic) goods, and so diminishes or destroys their utilities," City Check Cashing, Inc. v. Nat. State Bank, 244 N.J.Super. 304, 309, 582 A.2d 809 (App.Div.) (quoting Hundred East Credit Corp., supra, 212 N.J.Super. at 355, 515 A.2d 246), certif. denied 122 N.J. 389, 585 A.2d 391 (1990), as J & R recognized, "some consumer goods may not be diminished or destroyed through use...." 31 F.3d at 1274, n. 14. Consequently, we agree with J & R's statement that the result should not turn on "the acceptance of [that] definition." Ibid.
In Morgan, the Law Division case found to be unpersuasive by J & R, Judge Villanueva addressed the issue of whether franchises come within the Act. The defendant conducted a limousine business in New York and New Jersey that involved selling franchises to people who became drivers of vehicles leased from defendant. 211 N.J.Super. at 88, 510 A.2d 1197. Judge Villanueva emphasized that "[t]his franchise is offered for sale to the general public as any other merchandise is. No special qualifications or experience are required except having sufficient funds for the down payment." Id. at 100, 510 A.2d 1197. He concluded that "[a] franchise or business opportunity is `merchandise' within the intendment of the Act ..." Ibid. He believed that franchise "is subsumed within the terms `commodities', `services' or `anything offered, directly or indirectly the public for sale.'" Id. at 98, 510 A.2d 1197. He also noted that "when a franchisor solicits a person to enter into an obligation for a franchise, that transaction falls within the ... [Act's] definition of advertisement." Id. at 91, 510 A.2d 1197.[3] After observing that the Act contains no definition of "consumer," he also noted that when the Legislature wanted that *683 word to have a more limited meaning it did so, as in the Unit Price Disclosure Act, N.J.S.A. 56:8-21 to -25. Id. at 92-93, 510 A.2d 1197.[4] He also took into account the Franchise Practices Act, observing that it reflected the Legislature's determination "that distribution and sales through franchise arrangements in New Jersey vitally affect the general economy of the state, the public interest and the public welfare." Id. at 96, 510 A.2d 1197. As in Morgan, the subject franchise is too small to come within that statute. Id. at 96, n. 7, 510 A.2d 1197. But that is simply another reason for its inclusion in the Consumer Fraud Act.
The principle applied in Koscot, and expressed in Morgan, BOC, and Marascio is that the Act is concerned, not so much with the specific nature of the property, but rather with whether the property is generally made available to the public. That principle is also implied by Romain's reference to protecting people from unconscionable practices "engaged in by professional sellers seeking mass distribution of many types of consumer goods." 58 N.J. at 536, 279 A.2d 640. That is not to say that only mass-marketing is within the Act; however, it does mean that when mass-marketing or general offers to the public are present, restrictive definitions of what is being marketed are inappropriate.
Next, we turn our attention to the specific question of whether our interpretation of the Act is inconsistent with a proper application of the doctrine of ejusdem generis. We begin our analysis by noting that the doctrine "is not absolute but serves as a helpful guide in ascertaining legislative meaning...." Salomon v. Jersey City, 12 N.J. 379, 389, 97 A.2d 405 (1953). Generally speaking, it embodies the principle grounded in grammar, logic and reason that associated words and phrases may be looked to for the significance of doubtful words, and where general words follow particular words, in an enumeration describing the subject, the general words are construed to embrace only objects similar in nature to those enumerated by the antecedent specific words.
[In re Armour, 11 N.J. 257, 273, 94 A.2d 286 (1953).]
The often difficult problem is determining "what unmentioned particulars are sufficiently like those mentioned to be made subject to the act's provisions by force of the general reference." 2A Sutherland, Statutory Construction, § 47:18 at 289.
Despite what J & R says, investment in a franchise is not really the acquisition of a business even though the franchise is purchased "for the present value of the cash flow [it is] expected to produce in the future...." 31 F.3d at 1274. It is certainly not an investment in a going concern. Rather, it involves the acquisition of both goods and services. See Wheeler v. Box, 671 S.W.2d 75, 77-78 (Tex.App.1984). Relying on a federal case, Morgan put it this way:
Thus, in Bailey Employment System, Inc. v. Hahn, 545 F.Supp. 62 (D.Conn.1982), aff'd without op. 723 F.2d 895 (2 Cir.1983), the court determined that since a franchise was a form of license or privilege to do business under the franchisor's name or pursuant to the *684 franchisor's marketing plan or system, the sale of a franchise was a "commodity or thing of value" within the statutory definition of "trade or commerce" under Connecticut's Unfair Trade Practices Act, Conn.Gen.Stat. § 42-110a(4), which reads:
"Trade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this State. [Id. at 66, 510 A.2d 1197.]

[211 N.J.Super. at 98, 510 A.2d 1197.]
That concept accords with the definition of "franchise" in section 10-3 of our Franchise Practices Act: "`Franchise' means a written arrangement ... in which a person grants to another person a license to use a trade name, trade mark, service mark or related characteristics, and in which there is a community of interest in the marketing of goods or services...." N.J.S.A. 56:10-3(a).
The importance of interpreting the Act to cover franchises that are not sufficiently substantial to come within the Franchise Practices Act is supported by Lund v. Arbonne International, Inc., 132 Or.App. 87, 887 P.2d 817 (1994). At one point in Oregon, the consumer fraud statute was expressly limited to items purchased for personal or household purposes, id. at 822, a restriction which is not present in our statute. The Oregon statute was amended to cover franchises, distributorships and other similar business opportunities. Ibid. Citing the legislative history, the court included this justification for the amendment, as provided by the Attorney General:
With respect to franchises and distributorships, our experience with the fairly well-known program known as Dare to Be Great brought to our attention an unexpected flaw in the present Unlawful Trade Practices Act. That flaw exists where there are fraudulent solicitations of unwary and inexperienced citizens to become distributors and where the goods received [to be distributed were] purchased from their vendor, are not to be used, as the language of the statute now is, for personal, family or household purposes but rather are to be held by them for resale. If they're to be held by them for resale [then] the fraudulent misrepresentations that are used by the parent company are not subject to action by our division.
Now, again, the victims of these kinds of schemes are exactly the same kind of victim that the Act is concerned about but they're excluded from our protection simply because they were victimized into trying to become merchants rather than victimized into trying to buy something which they were going to use in their own house. House Committee on State and Federal Affairs, March 23, 1973, Tape 13, Side 1 at 166.

[Ibid. n. 7.]
Fortunately, our Act does not contain the limiting language previously present in the Oregon statute. We find persuasive the comments of the Attorney General quoted above, and we are satisfied that our legislation should be interpreted accordingly.
Putting our conclusion in terms of the doctrine of ejusdem generis, a franchise, not otherwise regulated by the Franchise Practices Act, is not merely similar in nature to the items enumerated in Section 8-1(c), but actually consists of those items in that it involves the provision of both services and commodities. Thus, it is covered as something offered to the public for sale. Moreover, as we observed in Neveroski, "The inclusion of the general language can logically be attributed to a legislative desire *685 to incorporate other consumer transactions which may not strictly come within the specifically defined categories." 141 N.J.Super. at 379, 358 A.2d 473. Since we believe that the transaction under question is, in essence, a consumer transaction, Neveroski provides further support for our conclusion even if one assumes that strictly speaking, a franchise is something different from the items specified in Section 8-1(c).

III

THE COMMON LAW FRAUD CLAIM AND THE LACK OF PARTICULARS AS TO BOTH CLAIMS
The elements of common law fraud are:
(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.
[Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997) (citation omitted).]
Kafky's complaint alleges that the defendants knowingly and falsely represented that they would provide him with customer leads, that they intended that he rely on the misrepresentation, and that he justifiably did so rely to his detriment. Moreover, he specified when the representations were made by month and year and when the transaction was consummated. Those allegations satisfy the requirement of Rule 4:5-8 that "[i]n all allegations of... fraud ..., particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable."
In the circumstances of this case, the failure of the complaint to specify which defendant did what, with respect to both claims, appears justifiable since, read indulgently, the thrust of the complaint is that the defendants were acting in concert.
Reversed.
NOTES
[1] The record reveals nothing with respect to disposition of the claims against the other defendants. Consequently, the order was not appealable as of right. R. 2:2-3(a)(1). Nonetheless, in the interests of justice, we hereby grant leave to appeal nunc pro tunc pursuant to Rule 2:4-4(b)(2).
[2] See Glengarry Glen Ross (New Line Cinema 1992) for a dramatic presentation of the importance to a salesperson of receiving good leads.
[3] The Act defines advertisement as including: "[T]he attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise..." N.J.S.A. 56:8-1(a) (emphasis added).
[4] N.J.S.A. 56:8-22 states: "As used in this act: `Consumer commodity' means any merchandise, wares, article, product, comestible or commodity of any kind or class produced, distributed or offered for retail sale for consumption by individuals other than at the retail establishment, or for use by individuals for purposes of personal care or in the performance of services rendered within the household, and which is consumed or expended in the course of such use." (Emphasis added.)